**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, AT NASHVILLE**

| | | |
|---|---|---|
| **PARADIGM INVESTMENT GROUP, LLC** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **No. _____** |
| **HARDEE'S RESTAURANTS, LLC,** | ) ) | **JURY DEMAND** |
| **Defendant.** | ) ) | |

_____

### VERIFIED COMPLAINT
_____

Comes the Plaintiff, Paradigm Investment Group, LLC, by and through counsel, and for Complaint against the Defendant, Hardee's Restaurants, LLC.

### I. PARTIES, JURISDICTION & VENUE

1.     Plaintiff, Paradigm Investment Group, LLC ("Paradigm"), is a Nevada limited liability company.  The members of Paradigm are residents of California, Florida, New Hampshire, and Washington.

2.     Defendant Hardee's Restaurants, LLC ("HR") is a Delaware limited liability company, with its principal office located in Franklin, Tennessee.

3.     HR is owned by Hardee's Funding, LLC ("HF"), a Delaware limited liability company with its principal office located in Franklin, Tennessee.

4.     HF is owned by Hardee's SPV Guarantor, LLC ("SPV"), a Delaware limited liability company with its principal office located in Franklin, Tennessee.

5.     SPV is owned by Hardee's Food Systems, LLC ("HFS"), a North Carolina limited liability company with its principal office located in Franklin, Tennessee.

6.     HFS is owned by CKE Restaurants Holdings, Inc. ("CKE"), a Delaware corporation, with its principal office located in Franklin, Tennessee.  CKE is also the indirect parent company of HR through an April 1, 2013 management agreement whereby HR conferred the ability to act on behalf and fulfill all duties and obligations of HR relating to the Hardee's brand and the franchise agreements.

7.     CKE is owned by CKE, Inc., a Delaware corporation, with its principal office located in Franklin, Tennessee.

8.     This action arises from franchise agreements containing provisions requiring all litigation to be instituted in the state or federal courts where HR's principal offices are located at the time suit is filed.  Substantially more than $75,000 is at stake.  This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## II.  BACKGROUND

9.     This is a case about a franchisor acting in bad faith and threatening to steal a long-standing and well-performing franchisee's investment.

10.     There is no doubt that Hardee's is a distressed brand.  Hardee's is in the lowest quartile in AUV and profitability, dead last in sales per operating hour, and dead last in drive-thru speed of service amongst its competitive set.  Trips to the annual restaurant finance conference make abundantly clear that lenders no longer desire to lend to this brand.   The ill-conceived decisions by brand leadership and recent extreme turnover in the C-Suite ranks have led to this reality.

11.     Despite the current brand condition, Paradigm has been and continues to be a highly successful Hardee's franchisee for more than twenty-five (25) years.  Over this time frame,

2

Paradigm has won nearly every award available to franchisees, including Franchise Operator of the Year, Franchise Developer of the Year, and the Wilmer Hardee Award. By HR's own metrics, such as their Balanced Scorecard and iLumen financial reports, Paradigm is one of the most profitable and successful operators in the Hardee's brand.

12. Paradigm currently operates seventy-six (76) Hardee's restaurants located throughout Alabama, Florida, Mississippi, and Tennessee, making it one of the largest Hardee's franchisees. Paradigm employs over 1,600 people working in or with direct oversight on those Hardee's restaurants. Paradigm's CEO, Donald Wollan, has more than fifty (50) years of experience in the restaurant business, including experience as Regional Vice President for Burger King Corporation, where he was once responsible for more than seven hundred (700) Burger King Restaurants on the West Coast. Paradigm is also a member of the Independant Hardee's Franchise Association ("IHFA"), whereon its principals, including Donald Wollan, have served as President multiple times. Paradigm is also on multiple IHFA Committees, including the Ops, Finance, Marketing, Development, Procurement, Human Resources, Technology, and Legal Committees.

13. From the start of 2001 through year-end 2024, Paradigm's Hardee's restaurants have generated over $1.6 billion in sales, and Paradigm has paid over $767 million in payroll to citizens of the states where those restaurants operate. In its initial acquisition of the markets beginning in 2000, additional acquisition and development of stores, and through multiple decades of R&M and capital expenditures, Paradigm has spent over $173 million on its restaurants. Most of the wealth of the members of Paradigm is tied up in this business. Additionally, many of Paradigm's restaurants operate in small rural towns, where the services necessary to operate the

3

restaurants heavily support those local communities, as do the tax dollars generated by Paradigm's operations.

14.     Over the same period, Paradigm has paid royalties to HR totaling more than $87 million.

15.     Over the same period, HR has not invested a dime in Paradigm's restaurants.

16.     Despite Paradigm's long-tenured success, massive investment, and significant payments to the brand, HR has now threatened to take Paradigm's restaurants without justification for pennies on the dollar.

17.     Franchising in the United States has undergone a transformation over the last decade, as private equity has acquired more and more franchisors. The franchising model works when the financial success of the franchisor is tied to the financial success of the franchisee. Private equity's focus on short-term royalty revenue has turned the franchise system on its head. Many franchisors now view their franchisees as their employees, who only exist to create short-term royalty income for their franchisors. These franchisors use the power imbalance between them and their franchisees to force their franchisees to pay fees that were never disclosed and to adopt business practices that they never bargained for and that are designed to benefit the franchisor at the expense of the franchisee.

18.     These private equity groups did not create the brands they purchase and really do not even care about the brand's long-term viability. Their game is to buy the system, gut overhead and administrative support to the franchisees, extract as much money as possible and later sell the system for a profit based on royalty stream. All the while it is the franchisees of those brands that suffer.

4

19.     Most large franchisors, especially those in the restaurant business, have always had operations manuals, originally designed to ensure quality and uniformity in the franchisee's products and services.  Because compliance with these standards was necessary to ensure the integrity of their products, the franchise agreements for franchisors utilizing an operations manual mandated that the franchisee comply with the operations manual, which can be amended from time to time by the franchisor.

20.     A common technique now frequently used by franchisors to hoist additional fees and business practices upon their franchisees is by, in effect, unilaterally amending the franchise agreement by amending the operations manual.  This method has become more widespread in the aftermath of changes to the restaurant industry brought on by the Covid 19 pandemic.  Through amendments to operations manuals, franchisors have increasingly sought to generate royalty income from these changes while burdening the franchisees with all of the associated expenses, including fees charged by the franchisors that were neither disclosed in the Franchise Disclosure Document ("FDD") nor the franchise agreement.  Whether implementation of these changes and assessment of the fees associated with them has a negative effect on the franchisee's bottom line is irrelevant to the franchisor, so long as the franchisor believes that they will generate some amount of gross revenue, and thus royalties, in addition to the fees themselves.  In other words, franchisors have never seen a sale they do not like, even ones that are unprofitable for the franchisee, because it means more royalty for the franchisor.

21.     When questioned by franchisees regarding these practices, franchisors will typically point out that: (1) the franchise agreement states that the franchisee must comply with the operations manual; (2) the franchise agreement also states that the franchisor can amend the

5

operating manual at the franchisor's pleasure; and (3) that the franchisor has amended the operations manual to include these fees/practices. Although many franchisees do not agree with their franchisor's position, they lack the financial power to fight the franchisor, and because if the franchisee refuses to pay these new and previously undisclosed fees, the franchisor will simply default them and eventually take their investment.

22. Alarmed by this trend, in July 2024, the FTC issued Staff Guidance on the Unlawfulness of Undisclosed Fees Imposed on Franchisees, a copy of which is attached as <u>Exhibit 1</u>. The Staff Guidance states, in part:

> The Franchise Rule requires franchisors to disclose fees in a Franchise Disclosure Document (FDD) so that prospective franchisees are advised of their likely purchase obligations while operating the franchise.[2] The issue of franchisors imposing and collecting fees from franchisees that were not disclosed in their FDDs recently has been raised with the FTC in various forums . . . We've heard that one way franchisors may impose previously undisclosed fees is by making changes to the Operating Manual. . . .

> The Franchise Rule requires franchisors to disclose in the FDD certain fees.[8] If a franchisor fails to disclose those fees in the FDD, such failure is a violation of the Franchise Rule and Section 5 of the FTC Act.

> Furthermore, if a franchisor imposes or collects a new fee, through its operating manual or otherwise, that was not disclosed in the FDD and included in the franchise agreement, the franchisor may be engaging in an unfair act or practice in violation of Section 5 of the FTC Act.

23. For as long as Paradigm has been an HR franchisee, HR has had an Operations Procedures Manual (the "OPM"). The primary purpose of the OPM when it was developed was to ensure quality, efficiency, and uniformity in the preparation of Hardee's menu items and their presentation and sale to Hardee's customers. The OPM was never intended to provide an end run around the franchise agreement.

6

24. In 2013, CKE was purchased by Roark Capital Group "(Roark"), an Atlanta-based private equity firm that has acquired more than fifty franchisors. In 2021, HR attempted to unilaterally impose on its franchisees fees and business practices that were not contained in its FDDs nor franchise agreements, and that benefited HR at the expense of its franchisees, including Paradigm. HR has taken the position that it has amended the OPM to include these fees and practices, and that since the franchise agreements allow HR to amend the OPM as it pleases and require Paradigm to comply with the OPM, Paradigm must pay these fees and engage in these practices. Paradigm disagrees.

25. Around the same time, HR also began mandating strict compliance with its store operating hours, which are outlined in the OPM as 6am to 10pm. While these hours of operation were included in the OPM existing as of Paradigm's franchise purchases, HR has traditionally waived this requirement due to the differing regional operations of Hardee's restaurants and in connection with franchisees being in exclusive control of the day-to-day operations of their restaurants. Indeed, since the Covid-19 pandemic, incredible labor challenges have arisen that necessitate modified labor hours at most Hardee's restaurants. Businesses have been forced to adapt to the market realities of the post-Covid world, especially as it relates to severe labor shortages. Coupled with the extreme turnover with HR leadership and destruction of Hardee's burger business directly caused by the franchisor and at no fault of the franchisees, including Paradigm, modified hours are not only necessary they are often the only option for restaurant survivability.

26. Although HR has demonstrated that it is not possible to properly staff many of its own restaurants when operating sixteen hours a day, HR now insists that Paradigm do as HR has

7

ordered and comply exactly with the OPM.  HR is taking this approach while its own corporate-owned stores do not adhere to the operating hours outlined in the OPM, and while those same stores cannot meet other System Standards outlined in the OPM when operating under increased hours of operation.   Thus, as to operating hours, HR now seeks to impose a standard they do not themselves adhere to.

27.      These unjustified HR mandates have led us here. In January of 2025, with HR on its 4th CEO in 5 years, HR sent Paradigm a notice of default and termination, stating that if Paradigm does not do what HR has ordered it to do, all of Paradigm's franchise agreements will be terminated as of April 15, 2025.

28.      If Paradigm gave in to HR's demands, the harm to Paradigm would be immeasurable.  There would be no limit to the fees that HR could subject Paradigm to, Paradigm would be abandoning its expressly granted menu price control, and if store operating hours are imposed by HR it would force Paradigm to ignore other System Standards and destroy the unit economics of the restaurants where modified hours are critical.  Paradigm would ultimately default on its loan, which would constitute a breach of the franchise agreements and would put HR in the same position of threatening to steal Paradigm's restaurants. Paradigm will then be compelled to join the numerous Hardee's franchisees that have gone bankrupt and/or have been swallowed up by HR since Roark's purchase of CKE.  Thus, Paradigm has no choice but to seek redress from the Court for HR's unlawful business practices.

8

## III. FACTS

### A.    THE FRANCHISE AGREEMENTS

29.    Paradigm, through its predecessors in interest, purchased its first Hardee's franchises in 2000.  It subsequently purchased more franchises and at one time owned and operated one hundred and eighteen (118) Hardee's restaurants across six (6) different states.

30.    In connection with Paradigm's franchise purchases, Paradigm and HR have executed a number of franchise agreements, renewal agreements, and amendments (the "Franchise Agreements").  Examples of these agreements are attached as Exhibits 2 and 3. The Franchise Agreements are not all identical, but they all contain the following provisions that are material to this action:

(a)    All of the Franchise Agreements provide that Paradigm "shall establish menu prices in its sole and absolute discretion."

(b)    All of the Franchise Agreements provide that the franchisee shall pay the following fees: (1) Initial Franchise Fee; (2) Royalty Fee; and (3) Advertising Fee.  None of the Franchise Agreements mentions a "Technology Fee."

(c)    None of the Franchise Agreements contemplate Third Party Delivery.

(d)    None of the Franchise Agreements contemplate an App/Loyalty Program.

(e)    All of the Franchise Agreements allow HR to terminate the agreement for breach, but only if the breach is material; and

(f)    All of the Franchise Agreements provide that if either party brings an action, the prevailing party shall be entitled to recover its costs and expenses related to the action, including reasonable attorney's fees.

9

## B.     THE OPERATIONS AND PROCEDURES MANUALS

31.     HR also has an Operations Procedures Manual ("OPM").  A copy of the 2025 OPM

is attached as <u>Exhibit  4</u>.

32.     The Franchise Agreements provide that:

Franchisee further agrees to comply  with all System specifications, recipes, standards and operating procedures (whether contained in the OPM or any other written communication to Franchisee) relating to the appearance, function, cleanliness and operation of a Hardee's Restaurant,  . . ., that HR prescribes from time to time in the OPM, or otherwise communicates to Franchisee in writing, shall constitute provisions of this Agreement as if fully set forth in this Agreement.

33.     The 2025 OPM states:

[T]he term OPM also includes all written correspondence by Hardee's Restaurants LLC ("HR") regarding the System (as defined in your Franchise Agreement), other publications, materials, drawing, memoranda, videotapes, CDs, DVDs, audio tapes, and electronic media, including but not limited to materials and media published on Star Academy, that HR from time to time may provide to the Hardee's restaurant. …

The OPM sets forth certain minimum standards, procedures, rules, regulations, policies, and techniques (the "System Standards") for operating a Hardee's restaurant. The System Standards apply to all Hardee's restaurants, corporate-owned or franchised, current and future, operating within the United States.  Each Hardee's restaurant must strictly adhere to the System Standards. …  Owner must ensure that each Hardee's restaurant meets or exceeds the System Standards. …

The System Standards are intended to protect HR and the System and are geared toward achieving consistency of product and service to guests.  The System Standards are not designed to control day-to-day operation of a Hardee's restaurant. … For a franchised Hardee's restaurant, Owner controls the day-to-day operation of the franchise Hardee's restaurant. …HR is not responsible for and does not direct or control operation of the franchised Hardee's restaurant. …

With respect to day-to-day operating procedures and policies, subject to the System Standards, Owner is solely responsible for the proper development and implementation of day-today operating procedures and policies.

If there are links or other materials in this OPM to detailed HR internal policies and  operating procedures that corporate-owned Hardee's restaurants must follow, unless the OPM says otherwise, these internal policies and operating procedures are not System Standards. If the System Standards require Owner to

10

develop its own policies and operating procedures for the Hardee's restaurant, Owner may use the HR internal policies and operating procedures as a resource, subject to the disclaimers, but Owner is not required to consider, adopt or implement those policies and procedures. These materials contain general information and what HR currently considers to be best practice information for its own operation of a Hardee's restaurant. HR believes the information in these materials may be helpful to Owner's operation of its Hardee's restaurant. HR provides Owner with access to the materials for informational purposes only. Owner's or Owner's management's use of any information contained in the materials is completely voluntary. HR does not mandate that Owner follow these policies or procedures, unless otherwise specified in this OPM. Owner is free to consider, adopt, implement, or ignore those policies and operating procedures as it sees fit and to the extent the policies and procedures in the materials are applicable to and appropriate for Owner's management of its own Hardee's restaurant.

HR urges Owner to consult an attorney concerning any specific legal questions Owner may have about any policy or operating procedure Owner adopts for its Hardee's restaurant. BY USING ANY MATERIALS IN THIS MANUAL THAT ARE NOT SYSTEM STANDARDS, OWNER AGREES TO THE RESPONSIBILITIES OUTLINED ABOVE AND TO THE FOLLOWING TERMS AND CONDITIONS: … 3) Owner agrees that it is using the information in the materials voluntarily and that HR has not required Owner to follow any policies or operating procedures in those materials. …

34.     The Franchise Agreement and OPM appear to have contradictions. On the one hand the Franchise Agreement requires adherence to the OPM, the OPM is defined to include everything the Franchisor has ever said or done, the OPM sets forth the System Standards, and those System Standards must be strictly adhered to. Therefore, everything the Franchisor has ever said or done must be strictly adhered to as a System Standard.

35.     On the other hand, the OPM has a lengthy and confusing introduction representing that franchisees solely control their day-to-day operations, that some materials are not "System Standards," and that some of the "System Standards" set forth in the OPM are voluntary and may be adopted or ignored in the franchisees' sole discretion.

11

36.     The OPM does not specify which of the System Standards are "completely voluntary."

37.     Included in the System Standards are: (a) the March 17, 2023 Memorandum from Roark Board of Director, George Condos, attached as Exhibit 5, announcing then acting CKE CEO Max Wetzel and stating: "Over the coming weeks, Max will focus on the bottom line of our franchisees;" (b) the May 4, 2023 Memorandum from then acting CKE CEO Max Wetzel attached as Exhibit 6, addressing the bankruptcy of 106 Unit Hardee's operator Summit Restaurant Holdings, LLC, and stating "Hardee's is working to improve the financial health of our operators;" (c) The September 1, 2023 Memorandum from then acting CEO Max Wetzel attached as Exhibit 7, announcing the appointment of present CKE CFO Mike Lenihan and stating "Mike has extensive experience in restaurant economics and partnering with franchisees to improve restaurant level performance.; and  the March 4, 2025 Memorandum from current CKE CEO Joe Guith attached as Exhibit 8,in which Mr. Guith stated that "[CKE] will have a relentless focus on improving unit level profitability."  The System Standard created by these memoranda is referred to herein as the "Unit Level Profitability Standard".   In the franchise context, "unit level profitability" refers to the financial success of individual franchisees.

38.     Paradigm has successfully operated its Hardees restaurants for over twenty-five years.  Despite receiving minimal assistance or support from HR, Paradigm continues to operate at a profit, although this has become increasingly more difficult.  Since Roark's purchase of CKE, the Hardee's brand has steadily deteriorated.  Many HR franchisees have defaulted on their bank loans and their franchise agreements and have been forced into bankruptcy or into a takeover of their franchises by HR.  On multiple occasions, HR has made distressed restaurant purchases,

followed by sales to new franchisees, then followed again by bankruptcies or distressed repurchases of the same restaurants by HR.

### C.    HR C-SUITE TURNOVER

39.    Paradigm's attempt to avoid the fate of its fellow HR franchisees has been complicated by extreme turnover of the HR and CKE C-Suite.  HR is on its fifth CEO, fifth COO (currently interim), sixth CFO, fourth CMO, and sixth CTO since just 2017.   This level of C-Suite turnover is unheard of and has been incredibly disruptive to the brand.  Every new person in these critical leadership roles has their own priorities, ideas, and even interpretation of the Franchise Agreements and OPM, and having twenty-six different leaders across five major roles in just eight years has led to significant confusion for franchisees, the Brand, and the customers.

40.    Beginning in 2021, HR determined that a number of Paradigm's policies were non-compliant with the System Standards and began attempts to force Paradigm to change these policies.  These attempts have been wildly inconsistent.  Paradigm has had numerous conversations explaining how Paradigm's policies are in both parties' best interests with various officers of HR, who regularly would express understanding or agreement, and the overt efforts to force "compliance" would subside, only to be ramped up again when that officer was replaced.  This process has continued for the past three and a half plus years.

### D.    THE NOTICE OF DEFAULT

41.    On January 15, 2025, counsel for HR delivered to Paradigm the Notice of Default and Termination that is attached as Exhibit 9 (the "Notice of Default").  The Notice of Default

13

notified Paradigm that HR considered Paradigm to be in default of the Franchise Agreements with respect to several business practices that had been in dispute for over three years. Specifically, pertinent to this action, HR claims that Paradigm is in default of the Franchise Agreements: (a) for failure to pay a monthly "Technology Fee" that HR had begun charging its franchisees in 2021 and which Paradigm had never agreed to pay; (b) because Paradigm does not participate in the HR app and loyalty program; (c) because Paradigm does not participate in third-party delivery; and (d) because a number of Paradigm's stores are not in compliance with the hours of operation. In the Notice of Default, HR announced that failure to comply with all of its demands on or before April 15, 2025 would result in termination of all of the Franchise Agreements and would result in Paradigm owing HR some $13 million in liquidated damages and that HR could exercise its rights to acquire the stores for a reduced value.

42.     Paradigm has been justified in its decisions not to participate in HR's unlawful demands. HR is mistaken in its belief that Paradigm has materially breached the Franchise Agreements, and that HR is entitled to terminate them for the following reasons, which are discussed in detail below:

(a)     HR has admitted that none of the actions or omissions contained in the Notice of Default are material breaches by Paradigm when HR induced Paradigm's lender to loan Paradigm $23 million by certifying that Paradigm was not in breach of any of the Franchise Agreements;

(b)     The Technology Fee was not disclosed in the Franchise Disclosure Documents ("FDDs") that were provided to Paradigm in connection with their franchise purchases nor is it contained in any of the Franchise Agreements;

14

(c)     Paradigm has never used the services that this allegedly "purely passthrough" fee is supposed to be used for;

(d)     The loyalty and app program, which solely benefits HR at the expense of its franchisees, is also absent from the FDDs and the Franchise Agreements and violates the express covenant in the Franchise Agreements that Paradigm has sole and absolute control over its prices;

(e)     HR's operation of the third-party delivery program, which is also not in the FDDs or Franchise Agreements, unlawfully charges franchisees royalties on an expense to the franchisees, attempts to bind franchisees to contracts which they are not permitted to see, and also violates the express covenant that Paradigm has sole and absolute control over its prices;

(f)     It is not possible for Paradigm to operate many of its stores until 10 pm. HR is well aware of this, as it closes many of its corporate-owned locations for the same reason. Keeping all of its restaurants open until 10 pm would cause Paradigm to violate other System Standards and other provisions of the Franchise Agreements;

(g)     Operating some of Paradigm's restaurants on modified hours does not cause any monetary harm to HR, and in fact benefits HR financially;

(h)     In fact, none of the things which HR complains causes them any monetary damages and thus cannot be material breaches of the Franchise Agreements. This is buttressed by the fact that Paradigm has conducted itself in the same way for over three and a half years, during which time HR has expressly represented in writing that Paradigm's conduct was not a material breach.;

15

(i)     In now threatening to terminate the Franchise Agreements for these reasons, HR is acting in bad-faith and has thus violated the covenant of good-faith and fair dealing.

43.     On January 31, 2025, Paradigm comprehensively responded to the Notice of Default with the letter attached as <u>Exhibit 10</u>, making most of the detailed arguments contained in this Complaint.  HR responded with the short letter dated February 27, 2025 that is attached as <u>Exhibit 11</u>.  In this "response" HR did not address any of Paradigm's arguments or reasoning.  In fact, nobody at HR has ever provided any reasoning to Paradigm that contradicts any of Paradigm's positions.  The February 27, 2025 letter from HR's counsel sums up the entirety of HR's position regarding why it insists that Paradigm adopt counter-productive business practices that violate the Franchise Agreements and the Franchise Rule: *Because we said so.*

44.     Further, in the April 1, 2025 email from legal counsel for HR to Paradigm attached as <u>Exhibit 12</u>, HR made clear they intend to terminate Paradigm's franchise agreements, exercise purchase option rights at reduced market value, and file a lawsuit to enforce specific performance.  The email closes by saying Paradigm's resources are better spent complying with HR's demands than in trying to protect its rights.

**E.    HR REPRESENTED THAT PARADIGM HAS NOT BREACHED THE FRANCHISE AGREEMENTS TO INDUCE PARADIGM'S LENDER TO LOAN PARADIGM $23 MILLION**

45.     HR/CKE and Paradigm have been dealing with these issues for over three and a half years.  These disputes are well-documented, as reflected by the July 1, 2022 letter from John Dunion, the COO of CKE at the time, to Paradigm's CEO attached as <u>Exhibit 13</u>.  In this letter, Mr. Dunion stated:

16

Pursuant to our discussion during the IHFA Board meeting and the subsequent email from your son Chris on June 22nd, I will take this opportunity to once again clarify CKE's position that Paradigm's compliance to standard restaurant operating hours and digital (3PD, Olo and Loyalty) participation are mandatory and not contingent upon additional negotiation. Any further discussion of those other matters so requested will be independent from these mandatory requirements.

Don, as you are well aware **the non-compliance extends for nearly a full year** despite our best-efforts including visiting with you in March.

(emphasis added).

.

46.     In 2021, Paradigm's lender, BMO Harris Bank, N.A., informed Paradigm that the lender was no longer interested in funding the Hardee's brand, which the lender viewed as too much of a risk. Paradigm thus was required to find a new lender. In 2022, in connection with Paradigm's application for a $23 million line of credit with this new lender, the new lender, Midcap Financial Trust ("Midcap"), requested that HR execute the Hardee's Franchisor Status Certificate attached as Exhibit 14 (the "Status Certificate"). Despite its apparently unresolved arguments with Paradigm over the issues ultimately included in the Default Notice and that had been in dispute since no later than the Summer of 2021, on February 25, 2022, HR represented in the Status Certificate that:

> To the best of Franchisor's knowledge, **Franchisee is not in material default of the Franchise Agreements** and there are no written notices of default issued to the Franchisee that remain unresolved. Accordingly, **Franchisor acknowledges that Franchisee is in good standing under each Franchise Agreement.**

(Emphasis Added). Paradigm's lender relied on this statement in deciding to loan Paradigm $23 million.

17

47. Every action that HR now claims supports its right to terminate Paradigm's franchise agreements existed prior to the Status Certificate stating that Paradigm was not in material default and was instead in good standing. Accordingly, either HR's current claims that Paradigm is in material default and not in good standing are false, or HR committed fraud in inducing the Midcap loan, which HR now directly jeopardizes by taking positions completely inconsistent with the representations it made to induce the loan.

## F. HR'S SPECIFIC CLAIMS OF BREACH

### 1. <u>The Technology Fee</u>

48. The sale of a franchise is regulated in much the same fashion as the sale of a secured investment. Franchisors are prohibited from making unfounded projections of financial performance to prospective franchisees by highly detailed disclosure requirements (intended to provide prospective franchisees with all of the material information needed to make an informed purchase decision).

49. By way of background, in the 1950s and 1960s, modern franchising took off as a method of doing business, but sales of franchises were unregulated and subject to widespread abuse.

50. Thousands of people lost their substantial franchise investments as a result of having been "misled as to the true risks involved in the franchise investment by the franchisor's failure to disclose material facts" concerning franchise offerings.

18

51.     State and federal State and federal regulators began to study the situation in the late 1960s and concluded that the sale of franchises was similar to the unregulated sale of securities in the 1920s.

52.     Over the course of the 1970s, the Federal Trade Commission also undertook to study misleading practices by franchisors in connection with franchisors' sales of franchised businesses.

53.     As a result, by the late 1970s, the sale of franchises came to be regulated in much the same fashion as the sale of securities under SEC Rule 10b-5.  In 1979, the FTC adopted a trade regulation rule governing the sale of franchises that is roughly modeled on the SEC Act (the "Franchise Rule").  The Franchise Rule, which was amended in 2007, can be found at 16 C.F.R. Part 436.

54.     The Franchise Rule requires a franchisor to provide a prospective franchisee with certain disclosures, contained in a written Franchise Disclosure Document ("FDD"), prior to the purchase of the franchise.

55.     The disclosures required by the Franchise Rule are categorized in numbered "Items." Item Five: Initial Fees states that the franchisor must disclose in an FDD all "initial fees," which are defined as fees that must be paid before the franchisee's business opens.

56.     Item Six: Other Fees requires the franchisor to disclose in its FDD "**all other fees** that the franchisee must pay to the franchisor or its affiliates, or that franchisor or its affiliates impose or collect in whole or in part for a third party."

19

57.     Paradigm purchased its first Hardee's franchises in 2000.     It subsequently purchased more franchises and at one time owned and operated 118 Hardee's restaurants across six different states.

58.     The FDDs that have been provided to Paradigm in connection with each of its franchise purchases have varied somewhat, but the Item Six fee disclosure has remained constant for each of the FDDs.  An example can be found on pages 19-23 of the 2020 FDD, attached as Exhibit 15.  There is a long list of "other fees," but this list does not include a "Technology Fee."

59.     In 2021, HR mandated franchisees pay a monthly "Technology Fee," (the "Technology Fee") of $150 per month.  HR claims that the technology fees "are all a pass through and CKE is simply serving as a fee consolidator to keep things as simple and cost effective as possible."     Attached as Exhibit 16 is the October 28, 2021 Memo announcing this allegedly "purely passthrough" fee. The initial demand for the Technology Fee outlined the following components of the fee: OLO integration ($85); OLO data menu management ($25); Punchh loyalty platform ($65); and mParticle data management ($10).   In 2022, Punch loyalty platform costs were removed from the Technology Fee and put into the Ad Fund.  The latest iteration of the Technology Fee was an August 2024 Memo from then acting CTO Justin Fasciola setting the Technology Fee to $160 per month but no longer outlining the components that make up the fee.

60.     HR knows that it is required to disclose the Technology Fee in its FDD and to include it in its franchise agreements in order to require payment of a Technology Fee.  This is evident because: (a) the Technology Fee is disclosed in the current HR FDD, a copy of which is attached as Exhibit 17 (pages 23, 37-38); and (b) Hardees now includes an obligation to pay Technology Fee in Appendix A to its Franchise Agreements, as demonstrated by Exhibit 18.  No

20

Franchise Agreement executed between Paradigm and HR contains such Technology Fee, nor did any then active FDD.

61.     Because the Franchise Agreements do not permit HR to charge a Technology Fee to Paradigm, Paradigm has never agreed to pay this fee.

62.     In addition to its failure to disclose the Technology Fee in the FDDs or include it in the Franchise Agreements, HR/CKE have made numerous misrepresentations about the fee. For example, in the June 16, 2021 memo from Phil Crawford, then acting CTO of CKE , CKE stated we "have committed that we will keep the [Technology Fee] at $150 per month/per restaurant thru December 2022." However, in a memo dated March 3, 2022, attached as Exhibit 19, from Ned Lyerly, then acting CEO, CKE changed the Technology Fee to $110 by removing $50 of the previous $150 charge and putting it in the Ad Fund. The resulting action of splitting the Technology Fee into two separate buckets resulted in a combined Technology Fee to franchisees of $160 per month (110 + 50). Thus, HR/CKE had already abandoned its June 2021 promise that the fee would not exceed $150 per month. Additionally, this memo demonstrates that there is no basis for HR to charge a separate Technology Fee to Paradigm, because HR easily moved an initial charge, the portion of the fee related to Punchh Loyalty, out of the Technology Fee and into the Ad Fund, which Paradigm diligently pays. Furthermore, the Franchise Agreements provide a mechanism for HR to increase the Ad Fund, as outlined in Section 5.E. of the Franchise Agreement, which would eliminate any new and undisclosed fees being imposed on Paradigm. Instead, HR attempts to impose a new category of fees in violation of the Franchise Agreements and FDD signed by Paradigm.

21

63. Paradigm has never used OLO, the Punchh loyalty platform, or mParticle data management, which are the original and only items outlined in the initial Technology Fee Memorandum, and Paradigm has not participated in the delivery and loyalty/app platforms. Since, according to HR, the Technology Fee is "all pass through and CKE is simply serving as a fee consolidator" and collecting money only to pay third-party vendor's for each franchisee's use of these services, HR has suffered no damages as a result of Paradigm's failure to pay the fee.

### 2. **The App and Loyalty Program**

64. In 2021, HR instituted an app and loyalty program, under which customers could join by downloading an app and signing up (the "Loyalty Program").

65. The Loyalty Program is not included in any of the Franchise Agreements and was not identified in any of the FDDs. The Loyalty Program did not make its way into the OPM until February 2025. HR takes the position that it, in effect, unilaterally amended the Franchise Agreements by stating in writing that all franchisees must use the Loyalty Program.

66. The primary benefit of a loyalty program is the customer data that it generates. Although HR forces its franchisees to use the Loyalty Program, HR keeps all the customer data and shares none of it with its franchisees.

67. The Franchise Agreements are clear in that the "Franchisee shall establish menu prices in its sole and absolute discretion". Despite this clear provision, HR uses the Loyalty Program to manipulate franchisees' prices, always to the detriment of the franchisee, and in direct violation of a franchisee's right to control its prices. Some examples include Free Famous Star with Cheese with any purchase; 20% off your entire order; 15% off any purchase after 2pm; BOGO

22

for $1 Famous Star or BOGO for $2 Famous Star after 2pm; 25% off your entire order during the month of December, 50% off Frisco Breakfast Sandwich, or the Hardee's Tender Moments NBA Finals Promotion in 2024 where CKE offered a no purchase necessary Free 3pc Hand-Bread Chicken Tenders for any guest who downloaded the Hardee's App and created a My Rewards Account.

68.     During an IHFA IT Committee meeting in September of 2023, then acting CKE CTO Phil Crawford, presented a slide to franchisee committee members, including Paradigm, showing a 9.2% fraudulent abuse rate for loyalty member signups, i.e., single customers signing up for loyalty multiple times for the sole purpose of getting freebies and discounts.

69.     The Loyalty Program violates the Unit Level Profitability Standard.

70.     The Loyalty Program is also related to the impermissible Technology Fee.

71.     HR has suffered no monetary harm as a result of Paradigm's unwillingness to succumb to HR's unlawful demand that Paradigm use the Loyalty Program, and thus any breach that results cannot be material.

72.     HR has previously represented that Paradigm's non-participation in the Loyalty Program was not material.


**3.     Third-Party Delivery**

73.     HR began demanding Paradigm use third-party delivery services such as UberEats and DoorDash in 2021 ("Third Party Delivery").

74.     Third Party Delivery is not included in the Franchise Agreements or the FDDs.

75.     HR again apparently maintains that it can unilaterally amend the Franchise Agreements as it pleases by simply issuing a written directive.

76.     Third Party Delivery creates a completely new area of serving products (outside of the restaurant location) that did not exist when Paradigm entered into its Franchise Agreements. This new area opens franchisees to new and previously unforeseen liability issues, increased and uncontrollable chargebacks and additional required oversight and expense concerning the same, leads to violation of System Standards regarding product hold times, and removes the restaurant customer from the end user to that of the delivery company, with the end user now becoming the delivery company's customer instead.

77.     Imposing Third Party Delivery on Paradigm would create yet another fee that was not disclosed in the FDDs or the Franchise Agreements. All of the Third Party Delivery services charge a delivery fee that must be paid by the franchisees.

78.     In order to participate in Third Party Delivery, HR demands that Paradigm bind itself to contracts that Paradigm is not a party to and is not allowed to review.

79.     Moreover, HR operates Third Party Delivery in a way that would breach the Franchise Agreements by causing Paradigm to pay royalties and ad fund fees that they do not owe. The Franchise Agreements require Paradigm to pay a 4% royalty and up to a 7% advertising fee on all "gross sales." Gross sales are defined in two similar ways under the Franchise Agreements. Some of the Franchise Agreements define "gross sales" as:

> Gross Sales for each Franchised Restaurant shall include all sales or other income arising at or from that Franchised Restaurant, less sales tax actually collected and paid to the taxing authority and any amounts received from sales of non-food items approved for use in connection with such promotional campaign if any, as approved from time to time by HF'S in its discretion.

24

The other Franchise Agreements defines gross sales as follows:

Gross Sales shall include all revenue from the sale of all services and products (except HR approved promotional items) and all other income of every kind and nature (excluding revenue from the sale of stored value gift cards or gift certificates but including revenue when gift certificates are redeemed or stored value gift cards are debited) related to the Franchised Restaurant, whether for cash or credit and regardless of collection in the case of credit; provided, however, that Gross Sales shall not include any sales taxes or other taxes collected from customers by Franchisee for transmittal to the appropriate taxing authority.

80. Under either of these definitions, delivery fees paid by a franchisee cannot be considered gross sales. A delivery fee is not revenue to a franchisee. It is an expense. It never reaches the hands of the franchisee. As self-evident as this appears, HR has taken the position that third-party delivery fees are revenue and thus are included in gross sales, and it requires franchisees to pay royalties and ad fund fees on this expense. By doing so, HR benefits at the expense of its franchisees.

81. Third Party Delivery as operated by HR, violates the Unit Level Profitability Standard.

82. HR also routinely conducts price promotions on delivery platforms that would violate Paradigm's express right to sole and absolute control of pricing. For example, in September of 2023, HR put a 2 for $5 promotion on Third Party Delivery platforms. This decision was made unilaterally and without any choice or ability for franchisees to opt out. To make matters worse, due to an error by HR, the promotion was set to 2 for $0 resulting in tens of thousands of dollars in lost product and sales to franchisees. Attached as Exhibit 20 is an email from then active CKE CTO Phil Crawford to members of the IHFA IT Committee, outlining this issue. CKE routinely

25

conducts price promotions on Third Party Delivery that would violate Paradigm's rights to solely and absolutely control its prices if it participated in Third Party Delivery.

83. In response to Paradigm's detailed arguments regarding this issue, HR has never offered any explanation as to how Third Party Delivery fees are Gross Sales as defined by the Franchise Agreements. Although individual officers of HR/CKE have expressed understanding, those officers have been replaced, and HR's current position is simply that Paradigm is wrong and that HR does not have to explain why.

84. For these reasons, the Third Party Delivery system employed by HR violates the Franchise Agreements, and thus Paradigm was not required to participate in it.

85. The Third-Party Delivery System is also related to the impermissible Technology Fee.

86. HR has suffered no monetary harm as a result of Paradigm's unwillingness to succumb to HR's unlawful demand that Paradigm use the Third-Party Delivery System, and thus any breach that results cannot be material.

87. HR has also previously represented that Paradigm's non-participation in the Third-Party Delivery System was not material.

### 4. <u>Operating Hours</u>

88. In the 2010s CKE developed an innovative and highly successful line of "Thickburger" sandwiches and supported these new menu items with a provocative advertising campaign. Examples of commercials promoting the "Thickburger" line of menu items can be

26

found at https://www.youtube.com/watch?v=b3BA5qCOnkc and https://www.youtube.com/watch?v=4E4XGeMRGDE

89.     The "Thickburger" ad campaign was highly successful and for a number of years Hardee's was competitive with McDonalds and other fast food restaurants during dinner hours. However, the other large fast food chains eventually developed menu items competitive with the "Thickburger" line of products and created their own ad campaigns to promote these new products. CKE, which had recently been purchased by Roark, did not adapt to this new competition, and by the time of the Covid-19 pandemic, the competitive advantage created by the "Thickburger" products and ad campaign had disappeared.  The "Thickburger" line of menu items was ultimately discontinued.  HR has done little to nothing since to enhance or promote its Hardee's lunch and dinner menu items, and as a result, sales during lunch and especially dinner hours have drastically declined.

90.     The OPM requires all franchisees and corporate-owned locations to keep their restaurants fully open – including the dining area and the drive-thru - from 6 am to 10 pm daily. (the "Minimum Operating Hours Policy"). For reasons explained below, this is not possible for many of Paradigm's restaurants, would cause the gross sales (and thus royalties paid to HR) at these restaurants to decrease, and would cause Paradigm's operating costs to dramatically increase, making it virtually impossible to stay in payment compliance with its loan, which would constitute a breach of Paradigm's franchise agreements.

91.     During the Covid-19 pandemic, many Hardees' restaurants, including Paradigm restaurants, were not required to comply with Minimum Operating Hours Policy, and instead were permitted to operate under modified hours.  After the pandemic receded, Paradigm initially went

27

back to normal operating hours, however, Paradigm discovered two issues. First, the pandemic dramatically changed the staffing ability of the restaurants as significantly less workers were available for jobs than prior to the pandemic. Second, Paradigm identified how much better many of its stores operated during reduced hours, how much better employee retention became, and how much more in total sales and profitability those reduced hour stores were able to generate than when they operated full hours. Due to these findings, in August of 2021, Paradigm again began submitting its modified operating hours to HR. Attached as Exhibit 21 is the August 8, 2021 email from Paradigm to HR on this issue.

92. Paradigm has been operating numerous of its Hardee's restaurants on modified hours continuously since September of 2021.

93. Despite initially approving Paradigm's modified hours, and even representing to Paradigm's lender that Paradigm's operations were "in good standing" and did not constitute a material breach of the Franchise Agreements, HR is now contending the opposite and demanding Paradigm take its modified hour stores to full hours.

94. HR's own financial records show that if Paradigm did what HR is demanding, Paradigm would be in loan default. A report from HR's financial reporting system, iLumen, shows that Paradigm is one of the most, if not the most, profitable franchisees in the entire Hardee's system. For the Fiscal Year 2023 Paradigm had store level AUV of $1,118,507 across 76 locations, with a store level EBITDA of 14.60%, for total EBITDA of $12.4 million. Over that same time frame, the 216 corporate owned and operated stores had store level AUV of $1,156,108, but store level EBITDA of only 6.18%, less than half of Paradigm's EBITDA. The difference in EBITDA is dramatic. If Paradigm operated as HR did, Paradigm's 2023 EBITDA would have been $5

28

million, a reduction of $7.4 million in EBITDA and cash flow. HR's EBITDA is not even sufficient to cover a typical franchisees debt service, capex, and overhead, and in addition to leading to imminent loan default, would cause unsustainable cash losses, and inevitable bankruptcy. Attached as <u>Exhibit 22</u> is the iLumen report taken from HR's own reporting website showing this stark reality.

95.     The majority of Paradigm's restaurants are located in Alabama, where there is currently a massive labor shortage. According to a December 13, 2024 interactive article by the US Chamber of Commerce, which can be found at https://www.uschamber.com/workforce/the-states-suffering-most-from-the-labor-shortage?state=ms,_ Alabama has 39 available workers for every 100 open jobs. The other states where Paradigm's restaurants are located have better labor markets but still suffer from significant labor shortages: Mississippi has 49 workers for every 100 jobs, Tennessee has 56, and Florida has 53.

96.     The lack of customers further complicates finding workers to cover dinner shifts. Because many Hardee's restaurants average less than 4 customers an hour after 2pm there is often nothing for workers to do. Most of the crime that occurs in Hardee's restaurants happens at night. Workers know that opportunities for advancement in pay and responsibility are less if they work dinner shifts. As a result of all these factors, it is impossible to adequately staff dinner shifts at these locations.

97.     The OPM contains a System Standard called "Instant Service" (the "Instant Service Policy"). The OPM defines the Instant Service Policy as "a system used to provide our guests with fast service during peak business hours." The policy is "designed to be used during peak business hours at restaurants that have high volume rush periods." The policy applies during periods where

29

a restaurant averages $150 - $600 in sales for half-hour periods. The Instant Service Policy has specific staffing requirements requiring no less than eight (8) employees working during these peak hours.

98.     The hours of 6am to 11:30am are uniformly Instant Service periods at Paradigm's restaurants, as they consistently generate more than $150 in sales every half-hour. Attached as Exhibit 23 are typical customer counts for Paradigm locations demonstrating the gross sales by the half hour for restaurants that are open full hours. Attached as Exhibits 24 are typical customer counts for the locations that are operating on modified hours. These customer counts show not only that the breakfast shift triggers Instant Service, but that the number of Hardee's customers after 2 pm is shockingly low.

99.     Paradigm's restaurant in Hartselle Alabama is a great example of the benefit to HR, the brand, the customers, and Paradigm of modified operating hours. In August of 2021, Hartselle operated 16 hours a day. Average daily sales were $2,758 on 379 average daily transactions, but due to the excessive hours of operation and extremely low level of sales and transactions after 2pm (the store averaged sales of $19 per half hour from 2pm on), it was not possible to properly staff key breakfast (which averaged $239 per half hour) to meet Instant Service and also staff the shifts after 2pm. This store went to modified operating hours in September of 2021 and has remained there ever since. In August of 2024, this same store, operating on modified hours, had average daily sales of $3,699 on 406 average daily transaction, was able to execute Instant Service, and has actually grown its key breakfast sales to $352 per half hour. Thus, Paradigm's modified operating hours result in more store revenue, more royalty to CKE, the ability for Paradigm to adhere to Instant Service, the ability for Paradigm to retain employees, Paradigm serves more

30

Hardee's guests despite operating less hours, and results in a better store level unit economics than if Paradigm operated under full hours. Attached as Exhibit 25 is Paradigm's Hartselle location sales and transactions per half hour from August 2021 versus August 2024.

100. Because employees for dinner shifts cannot be found for the locations where adequate full-time staffing is not possible, if Paradigm were to staff restaurants for the dinner shift, it would have to borrow staff from the breakfast shift to work on the dinner shift. As a result, Paradigm would not be able to provide the Instant Service required by the OPM, which, according to HR, would put Paradigm in breach of its franchise agreements covering these locations.

101. HR is well-aware of the staffing problem at these restaurants. HR owns approximately 204 locations (the "Corporate Restaurants"). 16 of those stores are in the greater Birmingham, Alabama area, which is right next to Paradigm's Huntsville and Montgomery markets. Although the OPM applies to the Corporate Restaurants, HR does not adhere to the minimum operating hours standard in many of its corporate locations.

102. In addition to causing a breach of the Instant Service Policy, forcing Paradigm to strictly comply with the Minimum Operating Hours in all Paradigm restaurants causes both Paradigm and HR to lose money. It is critical to have the restaurants fully staffed during the busiest hours. Having the restaurant fully staffed when busy allows the restaurants to serve more customers more efficiently, thus increasing the restaurant's gross sales. Forcing Paradigm to borrow employees from the breakfast shift to staff the dinner shift causes Paradigm to lose gross revenue during the breakfast shift. Although Paradigm earns some gross revenue during the dinner shift, this revenue is less than the revenue lost at breakfast. Lower gross revenue means less royalty

31

payments to Hardee's, and thus both Paradigm and HR would lose money if Paradigm was forced to abandon modified operating hours at select stores.

103.    Although HR would lose money if Paradigm would be required to operate all its restaurants full hours, Paradigm's losses would be more substantial.  The dinner menu is more complicated and expensive to produce than the breakfast menu.  The food, labor, and other costs associated with the dinner shifts at these restaurants far exceed the gross revenue from the sparse customers, and thus Paradigm can only operate extended hours at a considerable loss.  In addition, due to the low customer counts after 2 pm, many hours are unprofitable, as the labor alone required to staff each hour exceeds the sales that are generated.   From a unit economics standpoint, these additional hours are simply unprofitable for the restaurant.

104.    Paradigm had numerous emails and phone calls with CKE's then acting CFO, Brandon Turner, regarding this very issue.  In the CFO's email responses and during those phone conversations, Mr. Turner was very receptive to Paradigm's analysis on the viability of modified operating hours, particularly as it related to unit level economics, and even said he "liked the idea of a Hardee's Express model."  Attached as Exhibits 26 & 27 are two examples of the email exchanges and organized phone calls between Paradigm and HR's CFO.

105.    Additionally, Paradigm is operating near the top of its peers in HR's own metric, the Balanced Scorecard.  Attached as Exhibit 28 is the Balanced Scorecard results for the full month (December 3, 2024 through December 30, 2024) immediately preceding the HR Notice of Default being sent to Paradigm.  The results show Paradigm has the third highest score on the Balance Scorecard among the twenty-one groups operating twenty-five or more locations, including better than all corporate operated locations.  Specifically, as it relates to Drive-Thru

32

breakfast speed, Paradigm is far and away the best operated group. In addition, as it relates to Customer Net Sentiment, Paradigm is better than three of the four corporate run markets. Clearly Paradigm's actions do not harm the brand, and instead place it at the top of operating franchisees and even better than HR's own run markets.

106. Despite C-Suite and Roark Board Memorandum touting unit economics as a principal concern, HR's recent attacks on Paradigm suggest it does not care that Paradigm would incur substantial losses if required to keep all of its restaurants open for full hours  HR appears to only see that Paradigm is not generating gross revenue, and thus royalties, however small by not being open full hours.  HR is either unwilling to look at the actual numbers or unable to understand that operating full hours generates less royalties for HR a worse experience for guests, and has a substantially negative impact on employees.

107. The Minimum Operating Hours Policy violates the Unit Level Profitability Standard.

108. Despite the facts that: (a) HR does not enforce the Minimum Operating Hours Policy on its corporate-owned stores; (b) in order to induce it into making a loan, HR represented to Paradigm's lender that HR was in full compliance with all franchise agreements despite Paradigm's non-compliance with the Minimum Operating Hours Policy; (c) forcing Paradigm to strictly comply with the Minimum Operating Hours Standard in all of its restaurants would cause Paradigm to breach the Instant Service Policy; (d) forcing Paradigm to strictly comply with the Minimum Operating Hours Standard in all of its restaurants would ultimately cause Paradigm to default on its loan; and (e) Paradigm's early closing of some of its stores does not financially harm HR in any way, but rather generates more royalty income from HR, HR insists that Paradigm's

33

non-compliance with the Minimum Operating Hours Policy is an inexcusable breach of all of Paradigm's franchise agreements that justifies terminating all of these agreements and putting 1,600 people out of work.

109.    HR is incorrect.  Paradigm's non-compliance with the Policy does not cause HR any harm and thus cannot constitute a material breach of the Franchise Agreements justifying their termination.  HR recognized this when they represented to Midcap that Paradigm was in full compliance with all of the Franchise Agreements, thereby inducing Midcap to loan Paradigm $23 million.  HR's refusal to waive the Minimum Operating Hours with respect to the OPM, when it is in both parties' best interest, while not requiring its corporate-owned restaurants to comply with the policy is a violation of the duty of good-faith and fair dealing.

## G.      THE NECESSITY OF INJUNCTIVE RELIEF

110.    If HR is allowed to effectuate the unlawful termination of the Franchise Agreements on April 15, 2025, and make good on its threat to unwind Paradigm's holdings, Paradigm will suffer catastrophic immediate and irreparable injury.  Virtually all 1,600 Paradigm employees will suddenly find themselves without a job.   Most of these employees are not in financial circumstances that would allow them to miss multiple paychecks, so they will be forced to find employment elsewhere.  It will be extremely difficult, if not impossible, for Paradigm to hire back these employees should the Court ultimately rule in Paradigm's favor.

111.    Further, the closing of Paradigm's restaurants, even temporarily, is highly likely to cause Paradigm to lose many customers that regularly eat at Paradigm's restaurants.  These

34

customers will be forced to find an alternative restaurant, and the long-term negative effect on Paradigm would be substantial.

112.     Termination of the Franchise Agreements will also immediately cause Paradigm to default on its bank loan.  Paradigm cannot operate without its line of credit.

113.     Closing Paradigm's restaurants would also cause Paradigm to go into default with its creditors, including many landlords.  The landlords will be forced to evict Paradigm, thereby making it impossible for Paradigm to re-open in the same location should it ultimately be successful in this action.

114.     Paradigm would be in breach of vendor contracts, and both contracted and non-contracted vendors would stop servicing Paradigm. Efforts to restart those vendor services will be inconsistent and likely lead to increased contract or service terms to Paradigm's detriment.

115.     Paradigm would be forced to de-image 76 restaurants across 4 states in an unreasonable time frame.

116.     HR would undertake the process of acquiring Paradigm's assets and land rights that Paradigm would not be able to easily unwind if Paradigm prevails.

117.     Although Paradigm would undoubtedly suffer significant monetary damage as a result of losing its employees, customers, locations, and vendors, and by defaulting on its loan, such monetary damage would be difficult to calculate.

118.     The termination of the Franchise Agreements would also cause substantial harm to others, including virtually all of Paradigm's 1,600 employees, Paradigm landlords, vendors, and its lender.

119.    On the other hand, a temporary restraining order and temporary injunction would cause little, if any harm to HR.  The business practices that are the subject of the Notice of Default have been occurring since 2021.   Those business practices do not cause HR to lose any significant amount of money.  On the contrary, some of these practices make more money for HR.   By HR's own metrics, the Balance Scorecard, Paradigm continues to be one of its best operated franchisees, there is no harm to the brand that HR can point to.  HR has already represented that this actions do not amount to a material default and that Paradigm is in good standing under its franchise agreements.

120.    An injunction allowing Paradigm to continue to operate its restaurants pending the outcome of this litigation would also serve the public interest, as it would allow some 1,600 persons to keep their jobs, continue the services of hundreds of additional employees throughout the states Paradigm operates in who service Paradigm's Hardee's restaurants, such as roofers, electricians, plumbers and the like, and keep state and local tax revenues flowing.

## IV.  CAUSES OF ACTION

## COUNT ONE

## DECLARATORY JUDGMENT

121.    Plaintiff incorporates all preceding allegations.

122.    A controversy exists between the parties regarding the rights and remedies of the parties under the Franchise Agreements.  The probability of HR's unlawful termination of the Franchise Agreements is substantial and of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

36

123.    HR has breached the Franchise Agreements and has committed an unfair and deceptive business practice by attempting to terminate the Franchise Agreements due to Paradigm's good faith refusal to pay a Technology Fee that HR cannot charge because it was not disclosed in the FDDs and is not included in the Franchise Agreements.

124.    HR has breached the Franchise Agreements and has committed an unfair and deceptive business practice by attempting to terminate the Franchise Agreements due to Paradigm's good faith refusal to participate in the Loyalty Program, when HR cannot demand such participation because : (a) the Loyalty Program was not disclosed in the FDDs or contained in the Franchise Agreements; (b) the Loyalty Program would violate Paradigm's exclusive control over pricing; and (c) Loyalty Program violates the Unit Profitability System Standard by forcing losses on franchisees to benefit HR; and (d) HR has admitted that Paradigm's refusal to participate in the Loyalty Program is not a breach of the Franchise Agreements and induced Paradigm's lender to lend to Paradigm for its Hardee's business based on this admission.

125.    HR has breached the Franchise Agreements and has committed an unfair and deceptive business practice by attempting to terminate the Franchise Agreements due to Paradigm's good faith refusal to participate in the Third Party Delivery program, when HR cannot demand such participation because: (a) the Third Party Delivery program was not disclosed in the FDDs or contained in the Franchise Agreements; (b) the Third Party Delivery program attempts to force Paradigm to enter into third-party contracts that were not disclosed in the FDDs or contained in the Franchise Agreements, and which franchisees are not allowed to see; (c) The Third Party Delivery program would improperly charging Paradigm royalties and ad fund fees on an expense in violation of the Franchise Agreement; (d) the Third Party Delivery program would

37

violate Paradigm's exclusive control over pricing; (e) the Third Party Delivery program violates the Unit Profitability System Standard by forcing losses on franchisees to benefit HR; and (f) HR has admitted that Paradigm's refusal to participate in the Third Party Delivery program is not a breach of the Franchise Agreements and induced Paradigm's lender to lend to Paradigm for its Hardee's business based on this admission.

126.    Unanticipated and unforeseen events and conditions have made it impossible or impractical for Paradigm to uniformly comply with the Minimum Operating Hours Standard.  At many of its restaurants, Paradigm cannot uniformly apply the Minimum Operating Hours Standard without violating the Instant Service Standard or otherwise breaching the Franchise Agreements. The Minimum Operating Hours Standard violates the Unit Profitability Standard. HR has breached the duty of good-faith and fair dealing by attempting to force Paradigm to uniformly adopt the Minimum Operating Hours Standard while its corporate restaurants do not uniformly comply with the Standard.  HR suffers no monetary loss as a result of some of Paradigm's restaurants not complying with the Minimum Operating Hours Standard, and in fact makes money as a result. There is no harm to the brand by Paradigm's actions, as HR's own metrics, the Balance Scorecard and iLumen reports, make clear that Paradigm is among the top operators in the brand. Additionally, HR has admitted that Paradigm's refusal to adhere to the Minimum Operating Hours Standard is not a breach of the Franchise Agreements and induced Paradigm's lender to lend to Paradigm for its Hardee's business based on this admission

127.    Paradigm has not breached the Franchise Agreements.

128.    If Paradigm has breached the Franchise Agreements, any such breach is not material and thus cannot serve as the basis for termination of the Franchise Agreements.

38

129. Paradigm is entitled to a declaratory judgment holding that:

(a)    Paradigm has not committed a material breach of the Franchise Agreements;

(b)    HR has no legal grounds for terminating the Franchise Agreements; and

(c)    The Notice of Default is an anticipatory repudiation of the Franchise Agreements. As a result, Paradigm is no longer bound by the Franchise Agreements and is entitled to damages through the end of their terms.

130. Paradigm is entitled to all costs related to this action, including reasonable attorneys fees.

## COUNT TWO

## BREACH OF CONTRACT/ANTICIPATORY REPUDIATOIN

131.    Plaintiff incorporates all preceding allegations.

132.    HR has no legal grounds for terminating the Franchise Agreements.  The Notice of Default is an anticipatory repudiation of the Franchise Agreements.

133.    Plaintiff is entitled to compensatory damages in an amount to be determined at trial, but not less than $35,000,000.

134.    Paradigm is entitled to all costs related to this action, including reasonable attorneys fees.

## COUNT THREE

## INJUNCTIVE RELIEF

135.    Plaintiff incorporates all preceding allegations.

39

136. For the reasons stated above, Plaintiff shall suffer immediate and irreparable injury if HR is allowed to effectuate the unlawful termination of the Franchise Agreements on April 15, 2025, and make good on its threat to unwind Paradigm's holdings.

137. Closing down the Paradigm restaurants would also cause substantial harm to others, including the 1,600 Paradigm employees that would lose their jobs.

138. Allowing Paradigm to continue to operate its restaurants would cause no substantial harm to HR.

139. There is a strong likelihood that Paradigm's claims will succeed on their merits.

140. Paradigm is entitled to a Temporary Restraining Order, a Temporary Injunction, and a Permanent Injunction prohibiting HR from terminating the Franchise Agreements for the reasons contained in the Notice of Default. Specifically, HR should be restrained and enjoined from any action that would prohibit Paradigm from continuing to operate its Restaurants as it is currently operating them.

141. Paradigm is entitled to all costs related to this action, including reasonable attorneys fees.

## V. PRAYER FOR RELIEF

Premises considered, Paradigm respectfully requests the Court to grant it the following relief:

a. Empanel a jury of 6 to hear the issues joined by the pleadings;

b. Enter the injunctive relief requested in Count Three above;

c. Enter a declaratory judgment holding that:

40

(1) Paradigm has not committed a material breach of the Franchise Agreements; and

(2) HR has no legal grounds for terminating the Franchise Agreements

(3)

d. Award Paradigm compensatory damages in an amount to be determined at trial, but not less than $35,000,000;

e. Award Paradigm all costs related to this action, including reasonable attorneys fees;

f. Award Paradigm prejudgment interest;

g. Award Paradigm what further relief to which it may be entitled.

VERIFICATION

Under penalty of perjury, the undersigned, Donald Wollan, as Chief Executive Officer of Paradigm Investment Group, LLC, hereby declares that the factually allegations in the foregoing Verified Complaint are true and correct to the best of his knowledge, information, and belief.

Dated: April 14, 2025.

PARADIGM INVESTMENT GROUP, LLC

_____

By:     Donald Wollan
Its:     Chief Executive Officer

42

Respectfully Submitted,


s/ *Greg  Oakley*
Gregory H. Oakley, BPR #16237
J. Brad Scarbrough, BPR 20980
BUILDLAW, PLC
4300 Sidco Dr., Suite 200
Nashville, TN  37204
Ph 615-369-9996
Fx 615-515-4491
Email greg@build.law
        brad@build.law

*Attorneys for Plaintiff*